Boyd Wiggam (Wyoming Bar # 6-4059)
WYOMING LIBERTY GROUP
1902 Thomes Ave.
Ste. 201
Cheyenne, WY 82001
(307) 632-7020 [Tel.]
(307) 632-7024 [Fax]
boyd.wiggam@wyliberty.org

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 MAY 25   PM 2: 15

STEPHAN HARRIS, CLERK
CHEYENNE

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| UNNAMED PLAINTIFF #1, ) | | |
| UNNAMED PLAINTIFF #2, ) | | |
| PILLAR OF LAW INSTITUTE, ) | | |
| ) | | |
| Plaintiffs, ) | | |
| ) | | |
| v.  ) | C.A. No.   16-CV-135-S | |
| ) | | |
| FEDERAL ELECTION COMMISSION, ) | | |
| ) | | |
| Defendant. ) | | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Two Unnamed Plaintiffs and the Pillar of Law Institute respectfully bring this action for

declaratory and injunctive relief, and complain as follows:[1]

---

[1] A motion was filed with this complaint requesting this Court accept verification for this complaint from Unnamed Plaintiffs #1 and #2 under seal. The motion further requests that this Court accept exhibits under seal that will support a forthcoming motion for Unnamed Plaintiffs #1 and #2 to proceed under pseudonyms and for a protective order in this case.

## INTRODUCTION

1.     The 2016 election season has become a dangerous environment. As explained by Roger Stone, ally of Republican presidential candidate Donald Trump, "We will disclose the hotels and the room numbers of those [Republican National Convention] delegates who are directly involved in the steal" and "We'll tell you who the culprits are. We urge you to visit their hotel and find them." Olivia Becker, *Donald Trump Ally Threatens Delegates Who Would Try to 'Steal' Nomination at Convention*, VICE NEWS, Apr. 5, 2016, https://news.vice.com/article/donald-trump-roger-stone-threatens-delegates-steal-nomination-republican-convention. The alleged "steal" is the private efforts by Republican Party delegates to nominate the party's presidential candidate.

2.     While some describe this year's electoral results as a "hostile takeover" of the Republican Party, many delegates within the party believe the nominating contest is far from over. At the foundation of this controversy is the need for First Amendment protection of arguments and discussions about the principles of associational freedom and delegate autonomy. More concretely, delegate autonomy means that political parties are private institutions entrusted to select their own leadership and members without outside interference. *See generally Democratic Party v. Wisconsin*, 450 U.S. 107 (1981). These arguments are important and address the core principles of a free society, including how political parties function, because the First Amendment is the "matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937).

3.     The two Unnamed Plaintiffs are delegates to the Republican Party's national party convention. They are fearful of efforts by Donald Trump and his supporters to harass and intimidate delegates who may not support Trump.

2

4.      The Pillar of Law Institute ("Pillar") is a project of the Wyoming Liberty Group, a non-profit corporation. Pillar is concerned about education related to the issues of delegate autonomy and associational freedom. It is also concerned about delegates being harassed with baseless legal threats at the Republican national convention.

5.      A provision of the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30118, bans non-profit corporations from making contributions or expenditures "in connection" with delegates or national party conventions. This ban covers "anything of value." 52 U.S.C. § 30101(8)(A)(1); 11 CFR 100.52(d)(1). Pillar would like to support delegate autonomy. It would offer *pro bono* legal services to delegates who may, for example, be threatened with lawsuits sounding in defamation, campaign finance violations, or related areas. *See generally* Hadas Gold, *Donald Trump: We're going to 'open up' libel laws*, POLITICO, Feb. 26, 2016, http://www.politico.com/blogs/on-media/2016/02/donald-trump-libel-laws-219866; Patricia Mazzei, *Donald Trump threatens to sue Jeb Bush donor in Miami who bought anti-Trump ads*, MIAMI HERALD, Dec. 7, 2015, *available at* http://www.miamiherald.com/news/politics-government/election/article48446165.html; *Trump Threatens to Sue Washington Post Over Story on Casino's Bankruptcy*, NEWSMAX, Jan. 19, 2106, *available at* http://www.newsmax.com/Headline/Trump-Threatens-Sue-Washington-Post/2016/01/19/id/709992/; Jason Silverstein, *Artist who Painted Nude Donald Trump Portrait says his Legal Team has Threatened Lawsuit*, N.Y. DAILY NEWS, Apr. 17, 2016, *available at* http://www.nydailynews.com/news/national/artist-painted-nude-donald-trump-threatened-lawsuit-article-1.2604703.

6.      Pillar would like to distribute educational materials, including books, to delegates about their associational freedoms. Pillar would also like to offer a small set of delegate

opportunity scholarships to help defray the costs of travel and attendance at expensive convention functions.

7.     Pillar cannot engage in protected First Amendment speech and association due to the ban in 52 U.S.C. § 30118. Efforts to donate books, provide *pro bono* legal defense services, or offer small stipends are all prohibited under the law. Likewise, Unnamed Plaintiffs cannot associate with Pillar on these issues. At a moment when the United States will face one of the most acrimonious and contested conventions in its history, the protection of the First Amendment must upend 52 U.S.C. § 30118.[2]

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the First Amendment to the Constitution of the United States. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

9.     This Court has jurisdiction to award attorneys' fees, in its discretion, in this action. 28 U.S.C. § 2412(d)(1)(A).

10.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because Defendant is an entity of the United States government and the Wyoming Liberty Group, parent corporation of the Pillar of Law Institute, is headquartered in Wyoming.

## PARTIES

11.     Plaintiff Pillar of Law Institute is a program of the Wyoming Liberty Group, a nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Code. Wyoming

---

[2] At the present time, Pillar has not engaged with delegates to the Democratic National Convention. However, provided its funding is sufficient and if similar delegate autonomy issues present themselves at the Democratic National Convention, Pillar would like to offer substantially similar services there.

Liberty Group is headquartered in Cheyenne, Wyoming, and the Pillar of Law Institute operates out of Washington, D.C.

12.     Unnamed Plaintiff #1 is a duly selected delegate to the Republican National Convention.

13.     Unnamed Plaintiff #2 is a duly selected delegate to the Republican National Convention.

14.     Defendant Federal Election Commission ("FEC") is the federal agency charged with enforcement of the FECA and is located in Washington, D.C.

## STATEMENT OF FACTS

15.     Federal election law mutes the voices of delegates and outside groups wishing to discuss public policy as it relates to the Republican National Convention. Given the importance of the Convention and the issues surrounding the Republican nomination for president, emergency injunctive relief is required to protect First Amendment rights.

### *Understanding 52 U.S.C. § 30118*

16.     52 U.S.C. § 30118 bans corporations from engaging in educational and charitable projects simply because they might impact political party delegates or conventions. The ban operates in two ways. First, Section 30118 provides that corporations may not make any contributions or expenditures in "connection with any primary election or political convention or caucus held to select candidates for any political office. . . ." Second, it provides that corporate contributions or expenditures "in connection with any election" concerning delegates is likewise prohibited.

17.    Congress enacted the corporate ban to "prohibit the use of union or corporate funds for active electioneering directed at the general public on behalf of a candidate in a Federal election." 117 CONG.REC. 43,379 (1971).

18.    Restrictions on the First Amendment conduct of delegates and at political conventions diverge from the remainder of federal election law. Generally, "contributions" are "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A). There are notable exceptions, such as the law's allowance of corporate in-kind contributions of *pro bono* legal services, but only to political or candidate committees, and only as these services relate to designated areas of the law. *See* 52 U.S.C. § 30101(8); *see also* 11 CFR 100.86.

19.    Congress imposed contribution limits on money given by individuals to candidates and purposefully exempted delegates from the definition of candidate. *See* 52 U.S.C. § 30116. Thus, there are no limits on how much an individual may give to a delegate, but corporations, even non-profit corporations, are entirely prohibited from making any contribution to a delegate. 52 U.S.C. § 30118(a); *see also FEC Rules for National Convention Delegates*, FEC, http://www.fec.gov/pages/brochures/delegate.shtml (last visited May 20, 2016).

### *First Amendment Principles Relevant to Election Law*

20.    Since *Citizens United v. FEC*, the Supreme Court has held that egalitarian concerns about leveling the playing field or protecting against unfair advantages in the political marketplace are illegitimate government interests. 558 U.S. 310, 359–60 (2010). Only the prevention of *quid pro quo* corruption may serve as a valid government interest when regulating political free speech and association abutting elections. *See McCutcheon v. FEC*, 134 S.Ct. 1434, 1462 (2014).

21.    The Supreme Court and lower federal courts have protected political parties from outside intrusion and protected delegate autonomy. *See Democratic Party of U.S. v. Wisconsin*, 450 U.S. 107, 122 (1981) ("inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions—and that political parties may accordingly protect themselves. . . ."). Indeed, the Supreme Court has held that the right of political association is at its zenith when political parties select their nominees. *California Democratic Party v. Jones*, 530 U.S. 567, 575 (2000).

22.    Only a contrived reading of 52 U.S.C. § 30118 suggests it addresses government's proper concern about *quid pro quo* corruption. This is a regulatory system that allows individuals to contribute unlimited sums of money to delegates, but prohibits non-profits from providing legal aid, books, or even small stipends to delegates. It is also a system that permits designated corporate in-kind contributions to candidates and political party committees, but never permits the same to be given to delegates. It is a system that fundamentally infringes on the rights of delegates to engage in meaningful political association and free speech, necessitating its invalidation.

### Legal Harassment and the 2016 Republican National Convention

23.    Given the unique posturing of the 2016 election cycle, the Unnamed Plaintiffs fear retaliation, harassment, and threats if they promote delegate autonomy. Since 2015, Donald Trump has issued a variety of unsettling and threatening statements against individuals and groups that oppose his candidacy. Remarking on one Black Lives Matter protestor, Trump explained, "maybe he should have been roughed up." Jenna Johnson & Mary Jordan, *Trump on rally protester: 'Maybe he should have been roughed up'*, WASH. POST, Nov. 22, 2015, *available at*   https://www.washingtonpost.com/news/post-politics/wp/2015/11/22/black-activist-punched-

at-donald-trump-rally-in-birmingham/. Commenting in 2016, Trump explained that, if elected as President, he would "open up our libel laws" to be able to punish newspapers or groups that disagreed with him. *See supra* ¶ 5. Many leaders in the Republican Party have come to fear possible consequences of opposing him.

24.    This electoral season features a distinct climate of litigiousness, with Donald Trump threatening many individuals with lawsuits if they criticize or oppose him. *See, e.g.*, Rebekah Lowin, *Donald Trump previously threatened 'The Onion' with a lawsuit*, TODAY, May 15, 2016, http://www.today.com/news/web-extra-donald-trump-previously-threatened-onion-lawsuit-t92681 (detailing Mr. Trump's plan to sue a satirical website); Amanda Kabbabe & Nathan Smith, *Trump threatens to sue the New York Times over women 'hit piece'*, AOL NEWS, May 17, 2016, http://www.aol.com/article/2016/05/17/trump-threatens-to-sue-the-new-york-times-over-women-hit-piece/21378796/ (detailing Mr. Trump's plans to sue a major U.S. newspaper for its reporting on a public figure); Matt Flegenheimer, *Ted Cruz Rebuffs Donald Trump Ad Lawsuit Threat*, N.Y. TIMES, Feb. 17, 2016, *available at* http://www.nytimes.com/politics/first-draft/2016/02/17/ted-cruz-rebuffs-donald-trump-ad-lawsuit-threat/?_r=0 (detailing Donald Trump's legal threats to sue Republican candidate Ted Cruz over campaign advertisement); Ian Tuttle, *The Litigious—and Bullying—Mr. Trump*, NAT'L REV., Feb. 19, 2016, *available at* http://www.nationalreview.com/article/431575/donald-trump-tim-obrien-courtroom-story (detailing Donald Trump's failed litigation against a reporter for publishing a book critical of Trump). Unnamed Plaintiffs' Fears of future lawsuits are well-founded.

25.    Unnamed Plaintiffs would like to be able to associate with the Pillar of Law Institute and receive *pro bono* legal representation in the event they are threatened with lawsuits

sounding in defamation, allegations of campaign finance violations, or other areas of the law. Just as candidates and political parties may enjoy limited *pro bono* corporate legal services, delegates would like to be able to do the same to defend themselves.

26.     Unnamed Plaintiffs are concerned about the potential for legal harassment at the convention. They would like to protect their reputation and legal well-being by being able to associate with Pillar attorneys if they face legal harassment.

27.     Amidst this climate of fear, threats, and harassment, Republican delegates serve an important role in their party, deciding its values, how it will be governed, and, ultimately, its nominee for President. As a private institution, the Republican Party is free to select its own nominee based on its own rules and procedures. *Democratic Party of U.S.*, 450 U.S. at 122–23. But this requires the full protection of associational freedom under the First Amendment. Unlike Mr. Trump, whose reported wealth allows him the finest legal counsel, delegates require the protection of the First Amendment to associate so that they may defend themselves against legal threats.

### *The Pillar of Law Institute's Delegate Autonomy Project*

28.     As soon as this Court grants relief, Pillar would like to launch a delegate autonomy project. This project would provide delegates with relevant educational materials about the constitutional rights of delegates and political parties, a primer on how federal election law impacts these rights, and a background on the history of presidential nominating conventions in the United States. Pillar's educational material would not support or oppose the election or defeat of anyone running for federal office. Provided it has sufficient funding, Pillar would make its material available to delegates nationwide.

29.     Pillar intends to purchase a small collection of books related to delegate autonomy and past nominating conventions. It would like to contribute these books to delegates to help them better educate themselves about their role in the nominating process. Because Pillar is part of a 501(c)(3) non-profit corporation, federal election law bans it from providing books free of charge to delegates.

30.     Pillar is concerned about the potential for legal threats to be filed against delegates sounding in defamation, libel, or supposed violations of campaign finance law requirements. Pillar would like to have attorneys present near the Republican National Convention who would provide *pro bono* legal representation to any delegates facing threats of lawsuits or other forms of legal intimidation. Because Pillar is part of a 501(c)(3) non-profit corporation, it is banned from doing this.

31.     Pillar is concerned that many delegates will suffer financial hardships in attempting to attend the Republican National Convention. *See* Natalie Andrews, *Delegates Turn to GoFundMe to Pay Way to Conventions*, WALL STREET J., Apr. 27, 2016, *available at* http://www.wsj.com/articles/delegates-turn-to-gofundme-to-pay-way-to-conventions-1461781747. A wealthy individual could pay delegates an unlimited amount of money to help defray travel expenses, but non-profit corporations are prohibited from doing so. Pillar would like to offer a small set of delegate opportunity scholarships. These are not unlike what other private educational or trade groups offer attendees to help defray attendance costs. Specifically, it would like to offer $500 travel stipends to delegates provided Pillar has sufficient funding. Once its available funds are eliminated, Pillar would plan to fundraise for additional scholarships. However, because federal law bans non-profit corporations from making contributions to delegates, Pillar cannot pursue this project.

10

32.     Pillar would like to pursue a similar delegate autonomy project in the 2020 presidential electoral cycle.

### Unnamed Plaintiffs' Right of Association

33.     The Unnamed Plaintiffs would like to have a rigorous discussion among delegates and the American people about delegate autonomy. They would like to be able to receive educational materials and books from Pillar. They would also like to be able to receive an opportunity scholarship. Lastly, they are fearful that frivolous lawsuits may be filed by Trump or his supporters against delegate autonomy supporters at the Convention. They would like to be able to receive *pro bono* legal representation by Pillar if that occurs. Federal election law imposes a complete prohibition against these acts of association thus violating the First Amendment.

### No Legitimate Government Interest Properly Tailored Supports 52 U.S.C. 30118

34.     The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]" U.S. CONST. amend. I.

35.     The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute." *McCutcheon*, 134 S.Ct. at 1441. Courts must "assess the fit between the stated governmental objective and the means selected to achieve that objective." *Id.* at 1445. The only legitimate government interest serving contribution limits is to prevent *quid pro quo* corruption. *Id.* at 1462. This is to ensure that "Government's efforts do not have the effect of restricting the First Amendment right of citizens to choose who shall govern them." *Id.*

36.     Where government has enacted individual contribution limits to candidates, related corporate contribution bans have been upheld. *Beaumont*, 539 U.S. 146. This is because

government determined that specific contributions triggered a risk of *quid pro quo* corruption and regulated them to prevent against that danger. *See United States v. Automobile Workers*, 352 U.S. 567, 585 (1957). Related corporate contribution bans then served to protect against circumvention of individual contribution limits, since otherwise people could evade individual limits by making contributions through the corporate form. *Beaumont*, 539 U.S. at 155.

37.     Unlike most federal election law, there are no contribution limits on what individuals may give to delegates. Because Congress saw no risk of corruption in individual contributions to delegates in the first place, it cannot then ban groups of people, or corporations, from making the same sort of contributions. This damages the right of associational freedom important in political gatherings and movements.

38.     Even though Congress permits corporations to offer designated *pro bono* legal services to candidate and political party committees, delegates are banned from receiving it. No governmental interest in preventing corruption can support an asymmetrical contribution ban targeting individuals (delegates) further removed from the political process while allowing the same in-kind contributions to be given to political party and candidate committees.

39.     Just as there is no compelling government interest to control how political parties govern themselves or select nominees, there is no governmental interest in abridging the associational freedom of delegates and interested non-profits from associating for the common advancement of political beliefs. *Democratic Party of U.S.*, 450 U.S. at 122; *see also Kusper v. Pontikes*, 414 U.S. 51, 57 (1973).

40.     Where Congress has maintained campaign finance laws that reach too far, courts have regularly invalidated those rules. *See, e.g., SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010); *FEC v. Mass. Citizens for Life*, 479 U.S. 238 (1986). Congress may not use too blunt an

instrument to target any risk of corruption. Here, Congress bans a whole spectrum of charitable and educational organizations that bear no risk of corruption from making contributions while allowing similarly situated individuals to contribute without limit.

## COUNT I

### Congress Cannot Ban Non-Profits from Distributing Books to Delegates

41.    Corporations are banned from making "contributions" which include "anything of value." 52 U.S.C. § 30101(8)(A)(i); 11 CFR 100.52(d)(1). The "provision of any goods or services without charge or at a charge that is less than the usual and normal charge for such goods or services is a contribution. Examples of such goods or services include, but are not limited to: securities, facilities, equipment, supplies, personnel, advertising services, membership lists, and mailing lists." 11 CFR 100.52(d)(1).

42.    Pillar would like to offer two books to delegates detailing principles of delegate autonomy and related constitutional precedent supporting this approach. Specifically, it would like to offer "National Party Conventions 1831-2008," retailing at $67.24, and "The First American Political Conventions: Transforming Presidential Nominations, 1832-1872," retailing at $55.00. *See* NAT'L PARTY CONVENTIONS 1831-2008 (2010); STAN M. HAYNES, THE FIRST AMERICAN POLITICAL CONVENTIONS: TRANSFORMING PRESIDENTIAL NOMINATIONS, 1832-1872 (2012). Neither of these books support or oppose the nomination or election of any candidate, yet 52 U.S.C. § 30118 prohibits corporations from donating them to delegates. Because the books are "anything of value," Pillar is banned from providing educational materials to private members of a private organization, the Republican Party.

43.    FEC regulations defining contributions make the definition ever more inclusive because simply providing "any goods" or "any services" without charge or at a lower rate is a

contribution. 11 C.F.R. 100.52(d)(1). No inquiry into whether the money is designed to support or oppose a candidate or nomination is required.

44.     There is no cognizable government interest in banning books. *See A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts*, 383 U.S. 413 (1966); *see also* Transcript of Oral Argument at 27, *Citizens United v. FEC*, 558 U.S. 310 (No. 08-205) (Justice Alito: "That's pretty incredible.  You think that if -- if a book was published, a campaign biography that was the functional equivalent of express advocacy, that could be banned?"). Moreover, any interest in preventing corruption is not met by a law that bans the charitable corporate contribution of books to delegates, especially when individuals are free to contribute without limit.

45.     There is no way to tailor a ban of educational books that satisfies constitutional scrutiny.

46.     Section 30118's overbroad reach banning the donation of books by non-profit corporations to delegates violates the First Amendment's guarantee of free speech and association.

**COUNT II**

**Congress Cannot Ban Non-Profits from Offering *Pro Bono* Legal Assistance to Delegates**

47.     Congress bans corporations from offering *pro bono* legal assistance to delegates under 52 U.S.C. § 30118.

48.     Congress presently permits corporate entities to donate *pro bono* legal services to two classes of regulated persons or entities under the FECA. First, corporations may contribute *pro bono* legal services to an authorized committee of a candidate or any other political committee if: (1) the services are provided for the sole purpose of complying with the FECA; (2)

14

the entity paying for the service is the regular employer of the individual providing the service; (3) the employer does not hire additional employees in place of the volunteer employee; and (4) the committee reports the value of the service, as well as the name of each person who performed the service and the dates of service. 52 U.S.C. § 30101(8)(B)(viii)(ii). 11 CFR 100.86; 100.146; 114.1(a)(2)(vii); *see also* FEC Advisory Opinion ("AO") 2006-22 ("Kontrimas"). Second, a corporation may provide *pro bono* legal services to a political party committee, but they do not have to be limited to compliance with the FECA so long as they do not further the election or defeat of a candidate. 52 U.S.C. § 30101(8)(B)(viii)(i); 11 CFR 114.1(a)(2)(vi).

49.     Corporations may offer wide-ranging *pro bono* legal services to political party committees and limited services to campaign committees. But delegates, even further removed from the electoral process, cannot receive *pro bono* legal services to help comply with the FECA or to generally protect against spurious lawsuits.

50.     This disparity in the law cannot stand. If there exists no corrupting influence for corporations to provide *pro bono* services to political party and campaign committees, it cannot be corrupting for corporations to offer similar *pro bono* services to delegates.

51.     Given the unfortunate number of threats and harassment in this electoral season, Unnamed Plaintiffs are fearful that pursuing delegate autonomy education in the weeks leading up to the Convention and at the Convention will subject them to spurious legal threats—and possibly lawsuits—designed to intimidate and hinder them. They seek the same protection under the law that campaign and party committees receive; to receive the *pro bono* legal assistance of lawyers through the Pillar of Law Institute.

52.     Because Section 30118 imposes an unsupported ban against delegates' right of free association, while allowing other similarly situated individuals the same freedom, it must

fail to survive review. Likewise, because the law imposes a ban against non-profit corporations from providing any legal *pro bono* assistance, it cannot be deemed properly tailored.

**COUNT III**

**Congress Cannot Ban Non-Profits from Offering Opportunity Scholarships to Delegates**

53.    Pillar would like to offer opportunity scholarships to delegates to help defray their travel and attendance costs. Pillar plans to offer a small set of $500 per delegate scholarships and will fundraise to provide more if relief is granted by this Court.

54.    52 U.S.C. § 30118 prohibits corporations from making contributions to delegates. Because the opportunity scholarships would constitute anything of value, they would be prohibited under the law.

55.    Asymmetrical contribution limits carry serious constitutional implications. *See Davis v. FEC*, 554 U.S. 724, 741(2008) (asymmetrical campaign finance contribution provisions that place significant burdens on some, but not on others, do not advance a government interest in preventing corruption and cannot withstand constitutional scrutiny); *Green Party of Connecticut v. Garfield*, 616 F.3d 213, 244–45 (2d Cir. 2010) (asymmetrical contribution limit triggers do not promote any government interest in preventing corruption and are invalid). Because Congress determined that individuals giving unlimited amounts of money to delegates is not corrupting, it cannot then ban groups of people in the non-profit form from doing the same activity. This only damages associational freedom by impairing the ability of average Americans to associate together for a common cause.

56.    Pillar is entirely banned from offering opportunity scholarships, infringing upon its free speech and association. Considering the unlimited contributions allowed from individuals, this ban does not plausibly serve the governmental interest of preventing corruption

or its appearance, and even if it did this asymmetric contribution limit shows the ban is not sufficiently tailored to address any such interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

1.     A declaratory judgment that 52 U.S.C. § 30118 is unconstitutional as applied to the Pillar of Law Institute and both Unnamed Plaintiffs.

2.     Preliminary and permanent injunctive relief against enforcement of 52 U.S.C. § 30118 related to Plaintiffs' activities described herein.

3.     Plaintiffs' reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412(d)(1)(A) or any applicable statute or authority, and further relief this Court may grant in its discretion.

4.     Any other relief that the Court deems just and appropriate.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Respectfully submitted,

Boyd Wiggam (Wyoming Bar # 6-4059)
WYOMING LIBERTY GROUP
1902 Thomes Ave.
Ste. 201
Cheyenne, WY 82001
(307) 632-7020 [Tel.]
(307) 632-7024 [Fax]
boyd.wiggam@wyliberty.org

Benjamin Barr*
Stephen R. Klein*
PILLAR OF LAW INSTITUTE
455 Massachusetts Ave. NW
Ste. 359
Washington, DC 20001-2742
(202) 815-0955 [Tel.]
benjamin.barr@pillaroflaw.org
stephen.klein@pillaroflaw.org

*Motions for pro hac vice admission pending.

May 25, 2016.

## PILLAR OF LAW INSTITUTE VERIFICATION

I, Stephen R. Klein, declare as follows:

1.  I am an employee of The Pillar of Law Institute, which is a program of the Wyoming Liberty Group.

2.  Pillar is located in Washington, DC. Its mailing address is 455 Massachusetts Ave. NW, Ste. 359, Washington, DC 20001-2742. Wyoming Liberty Group is located at 1902 Thomes Ave., Ste. 201, Cheyenne, WY 82001.

3.  I have personal knowledge of Pillar's activities, including those set out in this Verified Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

4.  I verify under penalty of perjury under the laws of the United States of America that the factual statements contained in this Verified Complaint concerning Pillar's existing and proposed activities are true and correct.

Executed on May 25, 2016.

Stephen R. Klein